[Cite as *State v. Olsen*, 2024-Ohio-5671.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J.<br>Hon. William B. Hoffman, J. |
| -vs- | |
| | Case No. 2023 CA 0070 |
| NATHAN OLSEN | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS:     Appeal from the Richland County Court of Common Pleas, Case No. 2023 CR 0070N

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     December 2, 2024

APPEARANCES:

For Plaintiff-Appellee

JODIE M. SCHUMACHER
Prosecuting Attorney
Richland County, Ohio

MICHELLE FINK
Assistant Prosecuting Attorney
Richland County, Ohio
38 South Park Street
Mansfield, Ohio 44902

For Defendant-Appellant

MEGAN M. PATITUCE
JOSEPH C. PATITUCE
16855 Foltz Industrial Parkway
Strongsville, Ohio 44149

*Hoffman, J.*

{¶1} Defendant-appellant Nathan Olsen appeals his convictions and sentence entered by the Richland County Court of Common Pleas, on one count of aggravated murder, three counts of murder, one count of discharge of a firearm on or near prohibited premises, one count of improperly discharging a firearm at or into a habitation or a school safety zone, two counts of felonious assault, and one count of improperly handling a firearm in a motor vehicle, with attendant 3-year and 5-year firearm specifications, following a jury trial. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE CASE AND FACTS

{¶2} On January 20, 2023, the Richland County Grand Jury returned a nine-count indictment against Appellant, charging him with: Count One, aggravated murder, in violation of R.C. 2903.01(A), an unclassified felony; Count Two, murder, in violation of R.C. 2903.02(B), an unclassified felony; Counts Three and Four, murder, in violation of R.C. 2903.02(A), unclassified felonies; Count Five, discharge of firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3) and (C), a felony of the first degree; Count Six, improperly discharging a firearm at or into a habitation or a school safety zone, in violation of R.C. 2923.161(A)(1) and (C), a felony of the second degree; Count Seven, felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree; Count Eight, felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree; and Count Nine, improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(A) and (I), a felony of the fourth degree. Counts One through Eight each included 3-year and 5-year firearm specifications. Appellant appeared before the trial court for arraignment on January 30, 2023, and entered a plea of not guilty to the Indictment.

{¶3} The matter proceeded to trial on September 29, 2023. The following evidence was adduced at trial:

{¶4} On the evening of October 22, 2022, fifteen-year old B.H. was home alone, playing video games in his bedroom at his family's Antibus Place, Mansfield, Ohio, residence. He was halfway down the stairs heading to the bathroom when he heard eight loud bangs. B.H. ran back upstairs, climbed onto his bed, and called his neighbors and his mother. His neighbors called the police. B.H. went outside, but did not see anyone. B.H. did, however, notice a piece of the porch railing was on the front lawn. B.H.'s parents arrived home. When police arrived, they took a statement from B.H. and his father. Police also photographed the porch and inside the home. B.H. noted there were three holes in the wall of his bedroom and bullet casings were found on the floor.

{¶5} B.H. stated he knew an individual by the name of Antonyo Powell. Powell was his mother's friend. Powell was homeless in October, 2022. When he visited B.H.'s home, Powell would use the WiFi. Powell was not allowed in the house if B.H.'s mother was not at home.

{¶6} Mansfield Police Officer Noah Waterer was on duty on the evening of October 22, 2022, when he and Officer Blair responded to a ShotSpotter alert for shots fired in the area of the Antibus Place residence.[1] Officers Waterer and Blair arrived at the Antibus Place residence, but found no evidence of gunfire or shots fired. Shortly after their arrival, the officers were dispatched to 23 Florence Avenue, where an individual, who was subsequently identified as Antonyo Powell, was laying in the alley. Officers Waterer and Blair called for EMS and requested more units. The officers attempted

---

[1] "ShotSpotter is an advanced system of sensors, algorithms, and artificial intelligence that detects, locates, and alerts police to gunshots in real time." *State v. Edmonds*, 2020-Ohio-1148, ¶ 5, fn. 1 (7th Dist.).

lifesaving measures on Powell. EMS arrived and transported Powell to the hospital. Powell succumbed to his wounds. While Officer Waterer responded to the hospital to collect Powell's clothing, a team of officers continued to sweep the area for evidence.

{¶7} During the late evening of October 22, 2022, Cindy Reed, an evidence technician in the forensic science section of the Mansfield Police Department, was sent to Antibus Place to assist with what turned out to be a homicide investigation. When Reed arrived at the scene, she learned Powell was standing on the porch of the Antibus Place residence, or was in the area on a bicycle, when shots were fired at him. Reed photographed the Antibus Place residence and the alley next to 23 Florence Avenue, where Powell ultimately collapsed. Reed also took possession of Powell's clothing which had been collected by Officer Waterer at the hospital.

{¶8} Detective Larry Schacherer of the Mansfield Police Department obtained video from the security cameras positioned on the Culligan Water company's building, which is located on the corner of South Main Street and Antibus Place. The video footage from one of the cameras, which was aimed directly at the location of the shooting, showed a vehicle turn off South Main Street onto Antibus Place. The driver of the vehicle, who was subsequently identified as Appellant, pulled up next to the front porch of the Antibus Place residence of B.H. and his family, where Powell was sitting on a bicycle. Appellant extended his arm out the vehicle window towards Powell. Nine small lights, the muzzle flashes of a gun, were visible through the windshield. Powell crawled onto the porch, "bust[ed] through the railing to the right side of the house down onto the alley and then ran north." Trial Transcript, Vol. IV, p. 584.

**{¶9}** Other portions of the video footage provided images of the vehicle involved in the shooting. The automobile was "a smaller, dark-colored, * * * four-door vehicle." *Id.* at p. 587. The amber light on the front bumper was on the side of the fender. A license plate was located on the front bumper. The taillights, specifically the brake lights, had round lenses. The incident captured on the video occurred between 8:29 and 8:31 p.m. on October 22, 2022.

**{¶10}** Utilizing details about the suspect vehicle and the time of the shooting, Detective Schacherer used the Flock Safety System ("Flock") and obtained nighttime pictures of a vehicle similar to the one involved in the shooting in the area of Park Avenue, east of Trimble Road, at 8:15 p.m. on October 22, 2022. Detective Schacherer also obtained the license plate number of the vehicle. Flock cameras record every vehicle which passes through a camera's intersection throughout the course of the day. Law enforcement personnel are able to search Flock using identifying information, including make, model, and color of a particular vehicle and time of day and Flock will provide images based upon those perimeters. A few days later, Detective Schacherer entered the plate number into Flock and found a Flock camera had recorded the vehicle moments earlier on South Main Street. Officers initiated a stop of the vehicle which was being driven by Abigale Finegan, Appellant's girlfriend.

**{¶11}** On the evening of October 15, 2022, Mansfield Police Officer Charles Hamilton and Officer Kiner responded to a burglary of Appellant's residence. Officers already at the residence radioed a description of a male who had fled the scene. While Officers Hamilton and Kiner patrolled the area, searching for the individual, Appellant drove up next to their cruiser in a black Volkswagen. Appellant "was very upset about the

whole ordeal that he had been broken into, and he stated that [the police] should find him before he does." Tr., Vol. III, p. 548. Appellant identified "Antonyo" as the individual he wanted to find.

{¶12} Officer Hamilton responded to Appellant's home on October 25, 2022, for a civil stand-by requested by Finegan. While at the residence, Officer Hamilton observed the black Volkswagen Appellant had been driving on the day of the burglary. Officer Hamilton ran the license plate at the time. On October 26, 2022, Officer Hamilton assisted in the traffic stop of the black Volkswagen, which was being driven by Finegan. After observing still shots from the Culligan Water security video, Officer Hamilton informed detectives Appellant's black Volkswagen could be the same vehicle used during the murder.

{¶13} Facebook posts and messages recovered from an account belonging to "Tate Olsen" indicated Appellant was angry with Powell for burglarizing his home while Appellant's family were there. The posts and messages also revealed Appellant's desire to see Powell dead. The posts and messages were made over a period of four to five days prior to Powell's murder. Chester Stollings, Appellant's cousin, confirmed Appellant used the name "Tate." Between October 18, 2022, and October 22, 2022, Facebook Messenger conversations between Appellant and Stollings revealed repeated comments by Appellant indicating he wanted Powell dead as he believed Powell was the individual who burglarized his home.

{¶14} Appellant visited Stollings shortly after Powell's murder. Appellant arrived in Finegan's black Volkswagen. Appellant told Stollings he was selling some guns to make money and asked Stollings if he wanted some extra bullets he had. Stollings belonged to

a hunting and shooting club and accepted the bullets. During the visit, Appellant informed Stollings the police had cleared him of any wrongdoing in Powell's murder. Stollings and Appellant spoke after Appellant moved to South Carolina for a job. Appellant was upset the police had taken Finegan's vehicle for evidence and was concerned about gunshot residue. Stollings subsequently decided to turn over the bullets Appellant had given him to law enforcement.

{¶15} United States Secret Service Agent Bryan Massolini conducts wireless investigations as part of his duties. After analyzing the cell phone data from Appellant's phone, Massolini placed Appellant near the Antibus Place residence at approximately 8:30 p.m. on October 22, 2022. While in that location, Appellant made three phone calls at 8:32 p.m., 8:33 p.m., and 8:34 p.m. The cell phone data placed Appellant in South Carolina on October 25, 2022. Appellant was subsequently apprehended in South Carolina.

{¶16} After hearing all the evidence and deliberating, the jury found Appellant guilty of all the counts contained in the Indictment. Appellant appeared before the trial court for sentencing on October 26, 2023, at which time the trial court sentenced Appellant to life without parole plus 22 ½ years.

{¶17} It is from these convictions and sentence Appellant appeals, raising the following assignments of error:

I. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MR. OLSEN'S MOTION TO CONTINUE OR, IN THE ALTERNATIVE EXCLUDE, AFTER THE STATE PROVIDED EXTENSIVE NEW DUPLICATIVE DISCOVERY AT THE ELEVENTH HOUR.

II. THE TRIAL COURT ABUSED ITS DISCRETION IN PERMITTING, OVER DEFENSE OBJECTION, THE STATE TO INTRODUCE THE WORDS OF A THIRD PERSON TO ESTABLISH THAT MR. OLSEN HAD A PRIOR CONVICTION PREVENTING HIM FROM LEGALLY POSSESSING A FIREARM.

III. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING CERTAIN EVIDENCE WHICH, INDIVIDUALLY AND CUMULATIVELY, PREJUDICED MR. OLSEN AND DEPRIVED HIM OF A FAIR TRIAL.

IV. MR. OLSEN'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

V. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.

I

{¶18} In his first assignment of error, Appellant maintains the trial court erred in denying his motion to continue after the State produced an extensive amount of discovery shortly before the scheduled trial date. Alternatively, Appellant submits the trial court should have excluded the use of the discovery at trial.

**{¶19}** We review a trial court's decision to deny a request for a continuance for abuse of discretion. *Hamad v. Hamad*, 2013-Ohio-2212, ¶ 13 (10th Dist.), *citing Young v. Young,* 2012-Ohio-4377, ¶ 6 (10th Dist.). "[A]buse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶20}** In evaluating whether the trial court abused its discretion in denying a continuance, appellate courts apply a balancing test which takes into account a variety of competing considerations, including the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; and whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case. *State v. Unger,* 67 Ohio St.2d 65, 67–68 (1981).

**{¶21}** On September 20, 2023, Attorney Aaron Schwartz, counsel for Appellant, filed a motion to continue, explaining he was in trial in another court and the trial was expected to last beyond September 26, 2023, the scheduled trial date. This was Appellant's fourth motion to continue; the trial court had granted the first three motions. Attorney Schwartz's reason for the request, to wit: another trial, was the same reason given for the previous requests. The trial court denied the motion.

**{¶22}** Attorney Schwartz filed a motion to reconsider, citing his ongoing trial as well as the State's late, ongoing disclosure of discovery since September 19, 2023. Attorney Schwartz noted the disclosures included new witness statements as well as over

56 hours of jail calls, adding he was unable to review the material due to his current trial engagement.  In response, the State conceded new discovery had been provided, but asserted "the majority of it was to ensure complete open file discovery had been provided." September 25, 2023 Motion. The State added it only intended to introduce one of the jail calls, which was approximately twenty (20) minutes long.  The trial court denied Appellant's motion to reconsider, but ordered the trial to commence the first business day after defense counsel concluded his current trial.

{¶23} The trial commenced on September 29, 2023, a Friday, with testimony scheduled to begin the following Monday, October 3, 2023. The trial court re-visited the issue of the State's late production of discovery. The State listed each discovery response provided to Appellant. Thereafter, Appellant narrowed his objection to the 56 jail calls recently disclosed. The State limited its intended use to, at most, one twenty-minute phone call. As discussions continued, the State committed to not introducing the jail calls as part of its case-in-chief, restricting the use of the one call to its cross-examination of Appellant, should he testify.

{¶24} Upon review, we find the record is devoid of any showing the jail calls were exculpatory in nature. Further, the State limited the number of jail calls it would potentially introduce to one twenty-minute call.  Appellant had two attorneys of record throughout the proceedings, and a third attorney appeared at trial.  Although Attorney Schwartz was in another trial prior to Appellant's trial, certainly one of the other attorneys had time to review the one phone call.  We find Appellant's claim there was no time to review the discovery is misleading. Ultimately, Appellant did not testify and none of the jail calls were introduced into evidence.  Accordingly, we find Appellant cannot established he was

prejudiced by the trial court's denial of his motion to continue and his motion to exclude. Although we find Appellant was not prejudiced by the State's delay in providing discovery, we, nonetheless, find such delay was inexcusable. The State was aware the jail calls existed and, with due diligence, could have obtained the recordings and provided such to Appellant in an expeditious manner. Even if Appellant was aware of the existence of certain materials, it was the State's duty to provide the material to him.

{¶25} Appellant's first assignment of error is overruled.

II

{¶26} In his second assignment of error, Appellant submits the trial court abused its discretion in permitting the State, over objection, to introduce the statements of a third party to establish Appellant was prohibited from possessing a firearm as a result of a prior conviction.

{¶27} During the testimony of Detective Richard Clapp, the State introduced Exhibit 107, an October 16, 2022 conversation on Facebook Messenger between Appellant and Kizzie Cornell.


PROSECUTOR: * * * I'd like to [sic] you read the first full message

that Mr. Cornell sends to [Appellant].

DET. CLAPP: It says, why, you think they will come back? Is the gun

you have registered?

* *

PROSECUTOR: What are they talking about?

DET. CLAPP: [Appellant] having a handgun.

PROSECUTOR: How does [Appellant] respond?

DET. CLAPP: Not taking that chance and you don't have to do that in Ohio, but all my –

Tr., Vol. VI, at p. 1011.

{¶28} Defense counsel objected.  Counsel for the parties approached the bench and the following sidebar discussion ensued:

DEFENSE COUNSEL: They're going to talk about him having a disability and he's not able to have a firearm and that gets into his prior record.

PROSECUTOR 1: So I'm not going to go into a disability. I am providing context to the conversation because of a message that appears further down. I'm not going to talk about if that's accurate or not or the legal ramifications. I'm simply going to go down to the bottom of the message that is important in this case.

PROSECUTOR 2: This goes to [Appellant's] knowledge.  State of mind is also an issue in any case or any prosecution. [Appellant's] state of mind.  It's his words.  They come in.

DEFENSE COUNSEL: Not with regard to prior convictions.  That, that's totally improper.  I think that part needs to be redacted.

TRIAL COURT: It might come in from somebody else, but to come in it's an admission by a party opponent.

DEFENSE COUNSEL: What do you mean coming in through someone else?

TRIAL COURT: Well, if someone else was on the stand saying that this person has a disability based upon a prior felony conviction, then it's not coming in. But these are statements he's making so –

PROSECUTOR 2: He's making the statement.

TRIAL COURT: Your client's not the one to come in, but – right, exactly. Your client is the one issuing these statements on here. Those are his own admissions.

DEFENSE COUNSEL: I respectfully disagree. I, I don't think that that is relevant in this case. It's highly prejudicial. Obviously, the, the State is playing – is bringing that out for a reason. So, again, I respectfully disagree and think some of that needs to be blacked out with regard to him having a prior conviction.

PROSECUTOR 1: Again, Your Honor, this goes to his state of mind.

TRIAL COURT: He's the one making the statement. I think it's fair game, so the Court's going to allow it and overrule the objection.

Tr., Vol. VI, at pp. 1012-1014.

**{¶29}** The State's examination of Detective Clapp continued:

PROSECUTOR: So, Detective, I think you were reading this particular message * * *

DET. CLAPP: Yes.

PROSECUTOR: Please continue reading.

DET. CLAPP: Not taking that chance, and you don't have to do that in Ohio. But mine are all clean.

\* \*

Kizzie Cornell states, but you aren't supposed to have a gun.

[Appellant] states, and?

Kizzie Cornell then states, so you will get in trouble for having a gun.

\* \*

[Appellant] states, ish.

Then [Appellant] states, rather be judged by 12 than carried by six.

PROSECUTOR: What does Mr. Cornell say?

DET. CLAPP: Whatever.

\* \*

PROSECUTOR: The context of this conversation, based on your training and experience, what is [Appellant] communicating to Mr. Cornell?

DET. CLAPP: That he has a gun.

PROSECUTOR: Is he afraid to use it?

DET. CLAPP: Does not appear that he is.

Tr., Vol. VI, at pp. 1014 -1015.

**{¶30}** Appellant asserts the trial court and the State incorrectly attributed the statements indicating Appellant had a gun to Appellant; therefore, admissible under the statement against interest hearsay exception. We agree. The statements were clearly those of Kizzie Cornell, not Appellant. Appellant contends Cornell's statements disclose Appellant's prior conviction and subsequent disability, and the trial court should have excluded the evidence.

**{¶31}** We find the statements by Cornell, "but you aren't supposed to have a gun" and "so you will get in trouble for having a gun," do not explicitly or implicitly suggest Appellant had a prior conviction and was under a disability.  Appellant's assertion to the same is speculative. Cornell does not mention Appellant having a prior conviction and there is nothing in the record to establish the jury inferred such.  Assuming, arguendo, the trial court erred in admitting the Facebook Messenger conversation, we find any error is harmless in light of the overwhelming evidence of Appellant's guilt as discussed infra.

**{¶32}** Appellant's second assignment of error is overruled.

III

**{¶33}** In his third assignment of error, Appellant argues the trial court abused its discretion in admitting certain evidence which, individually and cumulatively, prejudiced Appellant and deprived him of a fair trial.  The evidence about which Appellant complains is the State's introduction of firearm evidence unrelated to Powell's murder; testimony from Daniel Davison, an analysist with the Ohio Bureau of Criminal Investigation, which Appellant claims included matters outside his report; and the testimony of Lieutenant Webb regarding the accuracy of the ShotSpotter data.

**{¶34}** "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." (Citation omitted.) *State v. Romy*, 2021-Ohio-501, ¶ 49 (5th Dist.). The appellate court must limit its review of the trial court's admission or exclusion of evidence to whether the trial court abused its discretion. *Id.* The abuse of discretion standard is more than an error of judgment; it implies the court ruled arbitrarily, unreasonably, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). "When applying the abuse-of-discretion standard, a reviewing court must not substitute its judgment for that of the trial court." *In re E.L.C.*, 2015-Ohio-2220, ¶ 16 (12th Dist.).

**{¶35}** With respect to the admission of the firearm evidence, Appellant contends the State offered the evidence to establish Appellant was "a dangerous person of violent character." Brief of Appellant at p. 17. In addition to murder, Appellant was charged with felonious assault; discharging a firearm on or near prohibited premises; improperly discharging a firearm at or into a habitation or a school safety zone; and improperly handling firearms in a motor vehicle, as well as eight (8) 3-year firearm specifications and eight (8) 5-year firearm specifications. We find the firearm evidence was relevant to these charges; therefore, the trial court did not err in admitting such evidence.

**{¶36}** Next, Appellant submits the trial court erred in permitting BCI analyst Davison to testify "to matters beyond the scope of his expert report, in contravention to Crim.R. 16(K). Appellant maintains Crim.R. 16(K) prohibits an expert from testifying to matters outside the scope of his expert report.

**{¶37}** Crim.R. 16(K) provides, in relevant part:

{¶38} An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications.

{¶39} "The purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." (Internal citations and quotations omitted.) *State v. Buck*, 2017-Ohio-273, ¶ 33 (9th Dist.).

{¶40} During Davison's testimony, the surveillance video was played. The prosecutor asked, "Having watched that video, we had previous testimony that that video – that inside that vehicle we saw nine muzzle flashes. Based upon your training and expertise, would a vehicle in which we have nine muzzle flashes be conducive to locating GSR?" Tr., Vol. IV, at pp. 726-727. Davison responded, "Inside the vehicle, yes." *Id.*

{¶41} Although not specifically so stated in Davison's report, we find the challenged testimony is clearly within the realm of his expertise and not outside the scope of his report. We note Crim.R. 16(K) states the written report should be a "summary."

{¶42} Assuming, arguendo, the testimony the State elicited from Davison exceeded the scope of his expert report and the trial court erred in allowing the testimony, we find any error is harmless given the overwhelming evidence of Appellant's guilty, as discussed infra.

{¶43} Appellant further posits the trial court erred in allowing Lieutenant Toneli Webb to testify as to the accuracy of the ShotSpotter data. Appellant claims Lieutenant

Webb had no independent knowledge regarding the collection and maintenance of ShotSpotter data.

**{¶44}** Appellant's challenge to Lieutenant Webb's testimony goes to the weight of the evidence not the admissibility and is a matter primarily for the trier of fact. A jury is free to accept or reject any or all of the evidence offered by the parties and assess the witness' credibility. Even if the trial court erred in admitting Lieutenant Webb's testimony as to the accuracy of the ShotSpotter data, we find such was harmless in light of the evidence which established the ShotSpotter provided accurate data in this case.

**{¶45}** Appellant's third assignment of error is overruled.

IV, V

**{¶46}** In his fourth and fifth assignments of error, Appellant challenges his convictions as against the weight and sufficiency of the evidence. Appellant contends the State's case relied solely on speculation and there was no direct evidence establishing he was responsible for Powell's murder. We disagree.

**{¶47}** The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, paragraph two of the syllabus (1997). Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, while weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386–387. A finding a conviction is supported by the manifest weight of the evidence, however, necessarily includes a finding the conviction is supported by sufficient evidence and will therefore be dispositive of the issues of sufficiency of the evidence. *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.).

**{¶48}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

**{¶49}** On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶50}** Upon review of the evidence as set forth in our Statement of the Case and Facts, supra, as well as the entire record in this matter, we find Appellant's convictions were not against the manifest weight of the evidence and based upon sufficient evidence.

**{¶51}** Officer Charles Hamilton and other officers from the Mansfield Police Department were dispatched to Appellant's home on October 15, 2022, in response to a burglary. The officers who were first on the scene radioed a description of a male who had fled the residence. While Officers Hamilton was patrolling the area, searching for the described male, Appellant pulled up next to his cruiser in a black Volkswagen. Appellant was very upset and he stated the police should find him before he did. Tr., Vol. III, p. 548. Appellant identified "Antonyo" as the individual he wanted to find.

**{¶52}** Subsequently, on October 22, 2023, Mansfield Police Officers Waterer and Blair responded to a ShotSpotter alert for shots fired in the area of the Antibus Place residence. The officers arrived at the Antibus Place residence, but found no evidence of gunfire or shots fired. Shortly after their arrival, the officers were dispatched to 23 Florence Avenue, where they found Powell laying in the alley. Officers Waterer and Blair called for EMS and requested more units. Law enforcement personnel collected evidence from the Antibus Place residence and the alley where Powell was located, as well as video footage from security cameras on the Culligan Water company building.

**{¶53}** The video footage from the Culligan Water security cameras captured a smaller, dark colored automobile turn off of South Main Street onto Antibus Place, and pull up next to the front porch of the Antibus Place residence of B.H. and his family, where Powell was seated on a bicycle. Appellant extended his arm out the vehicle window towards Powell. The video footage revealed nine small lights, the muzzle flashes of a gun, through the windshield. Powell crawled onto the porch and moved toward an alley. Other portions of the video footage provided images of the vehicle involved in the shooting. The automobile was a smaller, dark-colored, four-door vehicle. The vehicle had distinct amber lights on the front bumper on the side of the fender, a front license plate, and brake lights with round lenses. The incident captured on the video occurred between 8:29 and 8:31 p.m. on October 22, 2022.

**{¶54}** Appellant's cell phone records placed Appellant in the area of Antibus Place at the time and on the day of Powell's murder. Appellant's Facebook posts and messages revealed his desire to see Powell, whom he blamed for the October 15, 2022 burglary, dead. Appellant admitted to detectives he had made the posts on his Facebook account.

**{¶55}** Utilizing details about the suspect vehicle and the time of the shooting, Detective Schacherer used Flock and obtained a nighttime picture of a vehicle similar to the one involved in the shooting in the area of Park Avenue, east of Trimble Road, at 8:15 p.m. on October 22, 2022, as well as the license plate number of the vehicle. When Detective Schacherer entered the plate number into Flock a few days later, a Flock camera placed the vehicle on South Main Street moments earlier. Officers initiated a stop of the vehicle which was being driven by Finegan, Appellant's girlfriend.

**{¶56}** The trier of fact, in this case the jury, was vested with the authority to weigh the evidence and assess the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus (1967). The jury was free to accept or reject any or all of the evidence offered by the parties and assess the witnesses' credibility. Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. McGregor*, 2016-Ohio-3082, ¶ 10 (5th Dist.).

**{¶57}** We find the jury could reasonably conclude from the evidence presented at trial Appellant murdered Powell. We further find the trial court's verdict was supported by sufficient evidence and was not against the manifest weight of the evidence.

**{¶58}**    Appellant's fourth and fifth assignments of error are overruled.

**{¶59}**    The judgment of the Richland County Court of Common Pleas is affirmed.


By: Hoffman, J.

Delaney, P.J.  and

Gwin, J. concur